UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

PEDRO MARTINEZ ET. AL.,

                Plaintiff,

      -against-

GUTSY LLC. D/B/A CULTURE POP,

                Defendant.

**MEMORANDUM & ORDER**
**22-CV-409 (NGG) (RLM)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Pedro Martinez brings this action on behalf of himself and other similarly situated individuals against Defendant Gutsy LLC d/b/a Culture Pop for its "failure to design, construct, maintain, and operate its website to be fully accessible to and independently usable by Plaintiff and other blind or visually-impaired persons." (Compl. (Dkt. 1) ¶¶ 1, 4.) Plaintiff brings causes of action pursuant to Title III of the Americans with Disability Act ("ADA"), 42 U.S.C. §§ 12181 *et seq.*; the New York State Human Rights Law, N.Y. Exec. Law § 292 et seq.; the New York State Civil Rights Law, NY CLS Civ R. § 40 et seq.; and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-102, et seq. (*Id.* ¶¶ 57-112.) Plaintiff argues that "Defendant ['s] denial of full and equal access to its website, and therefore denial of its products and services offered, and in conjunction with its physical locations, is a violation of Plaintiff's rights" under these statutory authorities and requests corresponding injunctive, declaratory, and compensatory relief. (*Id.* at 26-27.) Defendant moves to dismiss the action in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

### I.  BACKGROUND

Martinez is visually impaired and legally blind. (*Id.* ¶ 2.) He therefore uses screen-reading software to access website content.

(*Id.*) For screen-reading software to function, the information on a website must be capable of being rendered into text. (*Id.* ¶ 22.) If the website content is not capable of being rendered into text, blind users are unable to access the same content available to sighted users. (*Id.*) An international website standards organization, the World Wide Web Consortium, has published version 2.1 of the Web Content Accessibility Guidelines ("WCAG 2.1"), which have become well-established guidelines for making websites accessible to blind and visually impaired persons. (*Id.* ¶ 24.) If a website does not adhere to these guidelines, it is inaccessible to blind users even when they are using screen readers. (*Id.*)

Defendant Gutsy sells probiotic soda through its website: "www.Drinkculturepop.com." (*Id.* ¶ 19.) Drinkculturepop.com is a commercial website that offers products and services for online sale. (*Id.* ¶ 26.) Plaintiff alleges that Defendant's website violates the Americans with Disabilities Act because it "contains thousands of access barriers that make it difficult if not impossible for blind and visually-impaired customers to use the website," and "impossible … to complete a transaction." (*Id.* ¶ 5.) He contends that Drinkculturepop.com's barriers are "pervasive" including, *inter alia*, "lack of alt-text on graphics, inaccessible drop-down menus, the lack of navigation links, the lack of adequate prompting and labeling, the denial of keyboard access, empty links that contain no text, redundant links where adjacent links go to the same URL address, and the requirement that transactions be performed solely with a mouse," and the inability to locate the shopping cart. (*Id.* ¶¶ 30-35.) Plaintiff alleges that he and other "blind Drinkculturepop.com customers are unable to determine what is on the website, browse the website or investigate and/or make purchases." (*Id.* ¶ 31.) Specifically, Plaintiff attempted to purchase Watermelon, Lime & Rosemary soda and the Feel Good Variety Pack on the website on January 19, 2022 but could not do so independently because of the above-described barriers. (*Id.* ¶ 40.)

## II. STANDARD OF REVIEW

Defendant seeks to dismiss Plaintiff's ADA and state and city law claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (*See generally* Defs.' Mem. On Mot. to Dismiss (Dkt. 15) ("Mot.").) When the court reviews a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court accepts as true all allegations of facts made in the complaint and draws all reasonable inferences in the plaintiff's favor. *See ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). A court will dismiss a complaint for failure to state a claim if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). [1]

## III. DISCUSSION

### A. Legal Framework

Title III of the Americans with Disabilities Act states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182 (a). Neither the question of whether a blind individual has been denied "full and equal enjoyment" of a commercial website nor the question of whether Defendant owns or operates that website are in dispute. Instead, Defendant's motion to dismiss presents a single as-yet unresolved legal question: whether the term "place of public accommodation" under the ADA covers commercial websites that lack any connection to a physical place. (Mot. at 1.)

---

[1] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

Defendant contends that a "place of public accommodation" under the ADA refers only to an actual, physical public-facing location of a business and that therefore only a commercial website with a nexus to a public-facing commercial space owned or operated by the website's owner or operator is covered under the ADA. (Mot. at 5-6.) In opposition, Plaintiff argues that (1) the term "place of public accommodation" in the ADA encompasses private commercial websites that affect commerce with or without a nexus to a physical place and (2) that the drinkculturepop.com website actually does have a sufficient nexus to a physical place if such a nexus is required. (Opp. at 3.)

Although Plaintiff brings claims under state and city anti-discrimination laws as well as under the ADA, the corresponding state and city law analyses mimic the analysis required for a claim under the ADA. *Graves v. Finch Pruyn & Co., Inc.,* 457 F.3d 181, 186 n.3 (2d Cir. 2006). Therefore, if Plaintiff's ADA claim survives this motion to dismiss, Plaintiff's state and city law claims automatically survive this motion to dismiss. On the other hand, if Plaintiff's ADA claim does not survive the motion to dismiss, it would be inappropriate for the court to exercise supplemental jurisdiction over the state and city law claims. *Id.* ("To the extent that [a plaintiff] brings a state-law disability-discrimination claim, it survives or fails on the same basis as his ADA claim"). For this reason, this court will not address those separate legal frameworks at the motion to dismiss stage.

### 1. Existing Precedent

The question of whether a standalone website is a place of public accommodation under the ADA has created a circuit split. The First and Seventh Circuits have found that an "electronic space" (i.e., a website) can itself be a place of public accommodation. *See Doe v. Mut. of Omaha Ins. Co.,* 179 F.3d 557, 559 (7th Cir. 1999). The Third, Sixth, Ninth, and Eleventh Circuits have held that places of public accommodation are limited to "physical

places," *Parker v. Metro Life Ins. Co.*, 121 F.3d 1006, 1010-11 (6th Cir. 1997), but that goods and services provided by a public accommodation, including those provided through that public accommodation's website, could conceivably fall within the ADA's protections if they have a sufficient nexus to the public accommodation's physical location. *See, e.g., Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000). This has come to be known as a "nexus" requirement. *Nat'l Fed'n of the Blind v. Target Corp.*, 582 F.Supp.2d 1185, 1195-96 (N.D. Cal. 2007). The Second Circuit has yet to weigh in on the question of whether a nexus of that sort is required, or the ADA covers standalone commercial websites in their own right.

This question has also created a split among district courts within the Second Circuit. *Compare Winegard v. Newsday LLC*, 556 F.Supp.3d 173, 174 (E.D.N.Y.2021) (holding that the "ADA excludes, by its plain language, the websites of business with no public-facing, physical retail operations from the definition of 'public accommodations'"), *and*, *Martinez v. MyLife.com, Inc.*, No. 21-CV-4779 (BMC), 2021 WL 5052745, at *2 (E.D.N.Y. Nov. 1, 2021) (arguing that the plain text of Title III "contemplates inclusion of only businesses with a physical location"), *with Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 393-95 (E.D.N.Y. 2017) (holding that there need not be a link between a "place" and the goods and services being offered in order to find that Title III applies to those goods and services, *i.e.*, the ADA applies to standalone websites).

District courts in the Second Circuit have not, however, been evenly split. The vast majority of courts in this circuit have taken the latter position, that commercial websites qualify as places of public accommodation independent of a nexus to a physical space. *See Romero v. 88 Acres Foods, Inc.*, 580 F.Supp.3d 9, 19 (S.D.N.Y. 2022) (collecting cases); *see also Tavarez v. Moo Organic Chocolates, LLC*, No. 21-CV-9816 (VEC), 2022 WL

3701508, at *2 (S.D.N.Y. Aug. 26, 2022) ("concur[ing] with the vast majority of other judges in this District who have decided the issue that a 'place of public accommodation' includes public-facing websites that are not tethered to a physical location" while "not[ing] that at least seven of its colleagues, one of whom has since ascended to the Second Circuit, have found that Title III of the ADA applies to websites"); *Wilson v. Fabric Cellar, Inc.,* No. 20-CV-244S, 2021 WL 2942354 (W.D.N.Y. July 13, 2021) (choosing to "assume without deciding" that the website is a place of public accommodation based on the weight of the case law in the circuit).

    2. Statutory Interpretation

This question of law is a matter of pure statutory construction. Paragraph 7 of the definitions section of Title III of the ADA contains several lists of types of entities that, so long as they affect commerce, are places of "public accommodation." 42 U.S.C. § 12181(7). The section is silent as to websites, but was enacted in 1990, before the broad proliferation of the internet into every aspect of everyday life. It reads as follows:

> (7) Public accommodation. The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce—
> []
>
> (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;
>
> (F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

*Id.*

### a. Textual Arguments

The sheer number of judges who, when presented with this statute, have diverged in their interpretations, tells this court that the plain language of Title III of the ADA is ambiguous as to whether standalone websites are covered entities under the statute. When, as here, there is ambiguity as to the correct interpretation of a statute, courts may use canons and other interpretive tools to understand the statute in question. *See, e.g.*, *Williams v. MTA Bus Co.*, 44 F.4th 115, 127 (2d Cir. 2022) ("If upon examination we find the text to be ambiguous, we look to traditional canons of statutory construction for guidance in resolving the ambiguity. Then, [i]f the text of the statute is not entirely clear, we turn to the broader statutory context and its history.") As is often the case with questions of textual interpretation, courts have used textual arguments to argue both in favor of and against inclusion of standalone websites as covered entities under the ADA. *See, e.g.*, *Winegard*, 556 F.Supp.3d at 175-80; *Romero,* 580 F.Supp.3d at 19-20.

Support for a nexus requirement, as opposed to a finding that the ADA applies to standalone commercial websites in their own right, has been found in the canons of *ejusdem generis* and *noscitur a sociis*. "The maxim *ejusdem generis* teaches that a residual clause's meaning should be confined to the characteristics of the specific items listed before it." *Winegard*, 556 F.Supp.3d at 178 (citing *Hall St. Assocs. v. Mattel,* 552 U.S. 576, 586 (2008)). Courts have relied on *ejusdem generis* to hold that standalone websites cannot alone properly be thought of as included in the relevant residual clauses within the ADA. *See id.* at 179. ("All the specific examples preceding Section 12181's residual clauses refer to brick-and-mortar locations. Applying the maxims of *ejusdem generis* and *noscitur a sociis,* the residual clauses must be read to reach only public accommodation[s] of the same type.").

7

But this argument is flawed. Some of the entities listed as public accommodations in § 12181(7)(E) and (F) are not *necessarily*, or even *predominantly*, brick-and-mortar places of commerce. In *Carparts Distribution Center, Inc. v. Automotive Wholesaler's Ass'n of New England,* the *First* Circuit noted that "travel services," which are explicitly covered entities for the ADA per the § 12181(7)(F) list, have historically conducted their business by phone or mail rather at brick-and-mortar locations. 37 F.3d 12, 19 (1st Cir. 1994). The court did not fully reach the question of whether a place of public accommodation must have a physical location in *Palozzi v. Allstate Life Insurance Co.* However, the Second Circuit's logic in that opinion indicates that the Circuit defines "insurance services" (also covered entities per the ADA) by what they provide rather than where they are located. 198 F.3d. 28, 32-33 (1999). There, the court rejected Defendant Allstate's argument that "Congress intended the statute to ensure that the disabled have physical access to the facilities of insurance providers, not to prohibit discrimination against the disabled in insurance underwriting" as inconsistent with the ADA's intent. *Id.* The reasoning in *Carparts* and *Palozzi* highlights the variation in the named entities within § 12181(7)(E) and (F)'s lists of public accommodations and leaves this court unconvinced that the residual clauses of "other sales or rental establishment" and "other service establishment" can fairly be read to refer only to brick-and-mortar places of commerce.

This court agrees that a residual clause in a statute should be read as consistent with the nouns in a preceding list. But perhaps the common threads running through the lists comprising § 12181 (7)(E) and (F) are threads of common function, rather than ones defined by physical presence. As Johanna Smith and John Inazu have argued, "[t]he statutory focus is on the entity's function: serving food, creating space for the public to gather, offering entertainment, providing education, offering banking or transportation services." Johanna Smith. & John Inazu, *Virtual*

*Access: A New Framework for Disability and Human Flourishing in an Online World*, 2021 Wis. L. Rev. 719, 766 (2021). (7)(E) is a list of entities engaged in commerce, while (7)(F) is a list of entities engaged in the provision of services. § 12181. It follows logically that any entity covered under the residual clause in (7)(E) must be one engaged in commerce while any entity covered under the residual clause in (7)(F) must be one engaged in the provision of services. "As written, the ADA thus provides guiding, limiting principles for courts to use a function-based analysis in applying the ADA's anti-discrimination requirements online. Courts assessing ADA public accommodation discrimination claims should thus first assess whether the entity with an internet presence functions like one on the non-exhaustive list of public accommodations in Title III." Smith & Inazu, *supra* at 767; *see also Morgan v. Joint Admin. Bd., Ret. Plan of Pillsbury Co. & Am. Fed'n of Grain Millers, AFL-CIO-CLC*, 268 F.3d 456, 459 (7th Cir. 2001) ("The site of the sale is irrelevant to Congress's goal of granting the disabled equal access to sellers of goods and services. What matters is that the good or service be offered to the public.").

Courts rejecting the inclusion of standalone websites as covered entities under Title III of the ADA have further argued that the phrase "place of public accommodation" should be read narrowly, in line with a dictionary definition of the word "place." *See Winegard*, 556 F. Supp. 3d at 179-80. But the phrase "place of public accommodation" is a term of art common to remedial civil rights statutes. Its definitions in such statutes have varied widely, demonstrating a chameleonic nature in order to deal with the harms such statutes are intended to remedy. *See, e.g.,* Oregon Public Accommodation Act, ORS 659A.400 (2021) ("A place of public accommodation … means any place *or service* offering to the public accommodations, advantages, facilities, or privileges whether in the nature of goods, services, lodgings, amusements or otherwise") (emphasis added). The phrase should be read

9

within its context and related history. And, in reading it that way, the court cannot rule out that the definition would sensibly include "electronic space[s]" as well as "physical space[s]." *Mut. of Omaha Ins. Co.*, 179 F.3d at 559.

Further, the term "place of public accommodation" must be read within the context of the broader statute. "We must not look merely at the plain language of a particular clause, but consider [it] in connection with the whole statute." *Grajales v. Comm'r of Internal Revenue*, 47 F.4th 58, 62 (2d Cir. 2022). Throughout the statute, when concerned with physical spaces rather than functional entities, the drafters of the ADA did not shy away from saying so. Section 12183, a separate subsection of ADA Title III, details what physical modifications to "facilities" are required under the law. 42 U.S.C. § 12183. This change in word choice – from "public accommodations" to "facilities" – when intending to discuss a physical space, further bolsters a textual interpretation of § 12181, in describing the covered entities under Title III, as having been concerned with entities' functions rather than their physical spaces.

  b. *Dynamic Interpretation in an Age of Technological Change & the Presumption Against Absurdity*

In the more than three decades since the landmark passage of the ADA, the internet has taken on a far greater role in the lives of Americans than the ADA's drafters could ever have imagined. Most recently, with the onset of the COVID-19 pandemic in March 2020, the near entirety of everyday American life moved online. Grocery shopping, already frequently partially online, moved there essentially in full. Kids attended school online; white collar workers logged on for the day from home rather than the office; families "went to the movies" by streaming in the living room. The dramatic extent to which the internet has changed what it means to participate in American society came front and center. As vaccination has become widespread and

pandemic restrictions have loosened across the country, some Americans have returned to in-person movie theaters, physical shopping centers, and lengthy commutes. But many others have not. If it was not already clear before 2020, it is clear today. An enormous share of the activities of daily life now happens online.

And, significantly for the case at bar, commerce is now transacted online as often as not. Artisans sell their wares on Etsy; Amazon has largely replaced the in-person convenience store. Any brick-and-mortar public-facing location of Bonobos or Warby Parker is an appendage to its core online business, not the other way around. The internet is replete with how-to guides for creating your own "E-store" and navigating the broader e-commerce landscape.

As an ever-greater proportion of the activities of everyday life and its myriad commercial transactions begin to take place online, a reading of the statute that limits its effect to entities transacting commerce in-person becomes one that renders the statute increasingly meaningless. A core maxim of statutory interpretation, the presumption against absurdity, tells us never to ascribe an absurd meaning to Congress. *See McNeill v. United States*, 563 U.S. 816, 822 (2011) (noting that "[a]bsurd results are to be avoided"). To the contrary, the court must always presume Congressional rationality in its drafting. This too weighs in favor of an interpretation of the ADA that includes standalone commercial websites.

### c. *Purpose and Legislative History of the ADA*

The overall purpose and scope of the ADA further weighs in favor of the inclusion of standalone commercial websites as public accommodations subject to the Act's mandates. As the Supreme Court made clear in its 2001 case *PGA Tour, Inc. v. Martin*, the statute is intended as a response to what Congress identified as a "clear and comprehensive national mandate to eliminate discrimination against disabled individuals, and to integrate them

11

into the *economic* and social mainstream of American life." 532 U.S. 661, 675 (2001) (emphasis added). And "[t]o effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life." *Id.* "As a remedial statute, the ADA must be broadly construed to effectuate its purpose of ... eliminat[ing] discrimination against individuals with disabilities*." Noel v. N.Y.C. Taxi and Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012).

This court also notes that the legislative history of the ADA weighs in favor of a dynamic interpretation of the statute that accounts for changes in technology over time. The House Committee Report published in the lead-up to the bill's passage specified that the "Committee intends that the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times." *Del-Orden v. Bonobos, Inc.*, No. 17-CV-2744 (PAE), 2017 WL 6547902, at *9 (S.D.N.Y. Dec. 20, 2017) (quoting H.R. Rep. No. 101-485, at 108 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 391.)

    d.  *Guidance from the Department of Justice*

Finally, guidance from the Department of Justice counsels in favor of a reading of the ADA that includes standalone websites. So long as the statute is ambiguous, *United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001), "[a] federal agency may receive deference with respect to the interpretation of a federal statute it administers." *Agyin v. Razmzan*, 986 F.3d 168, 187 (2d Cir. 2021). No federal agency has promulgated regulations that clearly define public accommodation for the purposes of the ADA in relation to the internet. However, "[a]s the agency directed by Congress to issue implementing regulations, see 42 U.S.C. § 12186(b), to render technical assistance explaining the responsibilities of covered individuals and institutions, § 12206(c), and

12

to enforce Title III in court, § 12188(b), the [Department of Justice's interpretation of Title III of the ADA is] entitled to deference," and that interpretation may be set forth through informal guidance documents. *Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (noting that its "conclusion is further reinforced by the administrative guidance issued by the Justice Department to implement the public accommodation provisions of Title III of the ADA.").

The scope of this court's deference to informal guidance issued by DOJ relating to Title III of the ADA is governed by the standard originally set forth by the Supreme Court in *Skidmore v. Swift & Co*. 323 U.S. 134 (1944). "A guidance document . . . is entitled to deference depending 'upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *Agyin*, 986 F.3d at 186 (quoting *Skidmore*, 323 U.S. at 140).

On Friday, March 18, 2022, the Justice Department published guidance on how the Americans with Disabilities Act relates to web accessibility. Dep't of Just., Guidance on Web Accessibility and the ADA (Mar. 18, 2022). The guidance is well-reasoned, informed by the Department's "specialized experience," *Skidmore*, 323 U.S. at 139, and consistent with the Department's position in its recent cases and settlements, *see, e.g.,* Press Release, Dep't of Just., Justice Department Enters into a Settlement Agreement with Peapod to Ensure that Peapod Grocery Delivery Website is Accessible to Individuals with Disabilities (Nov. 17, 2014). Therefore, this court affords *Skidmore* deference to this recent DOJ guidance according to its persuasive value. Relevant language from the guidance is as follows:

> Title III prohibits discrimination against people with disabilities by businesses open to the public (also referred to as

> "public accommodations" under the ADA). The ADA requires that businesses open to the public provide full and equal enjoyment of their goods, services, facilities, privileges, advantages, or accommodations to people with disabilities. Businesses open to the public must take steps to provide appropriate communication aids and services (often called "auxiliary aids and services") where necessary to make sure they effectively communicate with individuals with disabilities. For example, communication aids and services can include interpreters, notetakers, captions, or assistive listening devices. Examples of businesses open to the public: Retail stores and other sales or retail establishments; Banks; Hotels, inns, and motels; Hospitals and medical offices; Food and drink establishments; and Auditoriums, theaters, and sports arenas.
>
> A website with inaccessible features can limit the ability of people with disabilities to access a public accommodation's goods, services, and privileges available through that website—for example, a veterans' service organization event registration form.
>
> **For these reasons, the Department has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web.**

*Id.* (emphasis in original). Although not controlling, both DOJ's understanding of a public accommodation as any "business[] open to the public" and its specific position that the ADA's requirements apply in the internet context further weigh in favor of an interpretation of Title III that includes standalone commercial websites as places of public accommodation. *Id.*

14

### B. Application

This court now joins the substantial majority of district courts within the Second Circuit in holding that the ADA applies to standalone commercial websites irrespective of whether that website has a nexus to a brick-and-mortar commercial structure.

Finally, the court notes that Plaintiff's alternative argument that the "nexus test" has been satisfied is without merit. (*See* Opp. at 4-7.) The so-called nexus test, which this court rejects, requires a nexus between the website in question and a physical public-facing location owned or operated by the same entity as the website. *See, e.g. Target Corp.*, 452 F.Supp.2d at 949 (requiring a connection between the "information and services" offered on Target.com and physical *Target* stores). Here, Plaintiff's products are merely sold in other business entities' physical public-facing locations. This does not satisfy the nexus test. But this is of no matter, as this court holds that a nexus need not be found.

Instead, this court has considered the persuasive authority provided by its sister courts; its own textual analysis of the statute; the ADA's legislative history and purpose; and guidance on Title III issued by the Department of Justice. In doing so, this court has found ample support for a conclusion that standalone websites can and should be considered places of public accommodation for the purposes of the ADA, provided that those websites operate in one or more of the functional categories delineated by the statute.

Therefore, Plaintiff has plausibly stated a claim under the Americans with Disabilities Act, as well as under the New York State Human Rights Law and the New York City Human Rights Law. Title III of the Americans with Disabilities Act states "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities,

privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 USC § 12182 (a). Here, an individual, Plaintiff Martinez, has plausibly stated a claim that he has been discriminated against by Gutsy providing services on DrinkCulturePop.com that are allegedly inaccessible for him. And this court understands the term "place of public accommodation" within the ADA such that standalone commercial websites such as DrinkCulturePop.com are covered entities under the statute, and therefore holds that Plaintiff Martinez could plausibly be protected from such discrimination by the Americans with Disabilities Act and its state and local analogs.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is DENIED. Parties are DIRECTED to contact the chambers of the assigned magistrate judge for next steps in the case.

SO ORDERED.

Dated:   Brooklyn, New York
         November 29, 2022

                                              /s/ Nicholas G. Garaufis
                                              NICHOLAS G. GARAUFIS
                                              United States District Judge